2017, 13, 18, and 19. Mr. Pustanius, good morning. Thank you, Judge Lurie, and may it please the Court. In this case, the Board found Claims 1, 3, 7, and 8 of the 011 patent to be obvious. One of the core disputes between the parties in this case is whether the claims require both the storage and supplying of pure hydrogen, or whether the claims only require the supplying of pure hydrogen as it exits the salt cavern. The Board held, and this is at pages 28 and 62 of the appendix, the Board held that, quote, the claims do not require storage of purified hydrogen in the salt cavern. But that's a rather minor point here. It was in the prior op that one could store hydrogen in a cave, and that CO2 was a known contaminant. Claim 7 looks pretty obvious. Judge Lurie, the point here is that the storage has to be of the pure hydrogen. And what I wanted to get to is that, page 28 of the red brief, our friends Air Liquide concede that at least as to Claim 3, Claim 3 does require the storage of pure hydrogen. And understand that Your view is that Claim 3, in that respect, is no different from the other claims? Well, Claim 3 has other differences, because Claim 3 also has the In that respect. In that respect, that's right. But Claim 3 also has Nobody argued before the Board that Claim 3 was different from the other claims in this respect, right? I'm not sure that there was a distinction drawn before the Board, but of course, that's because this issue of claim construction never came up until the Board's decision. The Board, in the institution decision, Judge Dyck said that no construction was required. And in the final written decision, the Board, and importantly, not in the claim construction portion of its decision, decided that the storage of pure hydrogen was irrelevant. But of course, we now have a concession on appeal. And again, this is where I point you to page 28 of the red brief, that at least as to Claim 3, pure hydrogen is required. That, it seems to us, at least gets us a remand back to the Board and probably judgment in our favor, because there is no showing that anywhere in the prior art was there a disclosure, not in any of the references, of the storage of 99.99% pure hydrogen. And recall, Judge Dyck, that that's also what the Board took us to task for with regard to our expert on secondary considerations, Mr. Oates. The Board took us to task because he said, well, Mr. Oates, the Board said, well, Mr. Oates testimony only went to absolutely pure hydrogen. And that was an error of law that infected all of the elements, because based on the prior art, you would know that contamination would occur from storing this in a salt cavern, and that there would be motivation to scrub it when you took it out, right? Well, what the Board did not find is the combination of all of the elements. Because remember, what the invention here is, is the combination of a supply pipeline. The supply pipeline supplies pure hydrogen. And in times of high demand, that hydrogen goes directly to the customers. In times of low demand, that pure hydrogen that goes into the pipeline, and that's conceded to be pure that goes into the pipeline, at least with regard to Claim 3, then gets stored in a salt cavern. And what the Board never took account of are all of the reasons why a person of ordinary skill in the art, not knowing that the source of contamination was going to be hydrogen dioxide, would not have attached, if you will, the salt cavern to the direct pipeline. Quite the contrary, all of the prior art that existed, and that was cited against these claims, and it's also important to note this was fairly ancient art relative to the time of the patenting. This was 1979 to 1995 art, and the time of the patenting is 2004. None of that said, you're going to get hydrogen gas. The closest they come is the Scott reference, the 1981 patent that's only at issue in the 1071. But your problem is the Board found that the prior art would teach you that there was a risk of contamination from the storage. The Board found that there might be a risk of contamination as a general proposition. Yes. The Board did not find, however, that the risk was carbon dioxide, that it was carbon dioxide from storage in a salt cavern. And I come back to Scott, because that's the closest that you have of a disclosure of carbon dioxide being off-gassed, as the patent calls it, as the 011 patent calls it, into something that's being stored in a salt cavern. But look at what Scott is teaching. Scott's not talking about gaseous hydrogen. Scott's talking about liquid hydrocarbon. And the Board actually agreed with our expert that the physics of the transmission of carbon dioxide from a salt cavern into a liquid that's stored there, like the liquid hydrocarbons of Scott, was fundamentally different. The only thing the Board said is that it was a matter, citing our own expert, was that it was a But the amount that was given off in this case is what matters to the patent, because it's the purity of the hydrogen. And again, with regard to Claim 3, what we have is, coming back to at least Claim 3 and Claim 8, with regard to Claim 3, we have a concession by our friends on the other side that it requires pure hydrogen going into the cavern. There is no reference that teaches that. There is no finding by the Board based on that claim construction. And that also infects the Board's failure to take into account Claim 8 with regard to the secondary considerations, because this Claim 8 deals with 99.99% purity hydrogen. And the Board dismissed our secondary considerations arguments on the basis that we were only focusing on 99.99% so-called ultra-high purity hydrogen. And of course, that's at least wrong with regard to Claim 8. But even under this Court's decision in Rambis, there only has to be a reasonably commensurate relationship of the secondary considerations evidence to the scope of the claims. So I can certainly answer more questions with regard to the other claims, but our position is that the preamble of the claims sets forth the requirement of both storing and supplying under a product purity specification. We say that the Board was wrong with regard to that, because the storing also has to be under a product purity specification. Our friends have said that that's true as to Claim 3, but not as to the other claims. We say that it's true as to all of the claims. In that case, as I said, the same analysis that applies to Claim 3 now applies to all of the claims, because there is no evidence that there was storage of ultra-pure or pure hydrogen in a salt cavern prior to this invention. And the secondary considerations are powerful in this case, particularly when coupled with the ancient nature of the art as this Court set forth in Leo, citing old art. Nobody came up with this idea. Why didn't they come up with this idea? Well, the answer is that there was no reason for them to come up with the idea, because no one thought that you could store ultra-pure hydrogen in a salt cavern and combine it with a pipeline that was supplying ultra-pure hydrogen. And that's what this invention is. And as the examiner got it right back 10 years ago, when it said that there was no disclosure of this combination of elements, and we should be entitled to our claims back, but at the very least with regard to Claims 3 and Claim 8. Unless the Court has further questions for me, I'll return on rebuttal. Thank you, Mr. Stanius. We'll save you time. Good morning. The Board's findings that a person of skill in the art would have known that hydrogen could be contaminated by carbon dioxide when stored in a salt cavern, and would thus also have known that it would require purification before delivery to comply with the product purity spec, are subject to review for substantial evidence. In an effort to escape that deferential standard of review, Praxair attempts to manufacture legal issues by arguing that the Board misconstrued the claims. In addition to being inconsistent with the plain language of the claims and inconsistent with the specification, both of Praxair's claims construction arguments have been waived for failure to raise them before the Board. But regardless, even under Praxair's proposed claim constructions, the result here would be the same. Praxair first argues that the Board erred in interpreting Claim 1, the only independent claim, to permit storage of hydrogen at any purity level. Praxair instead contends, as you heard him argue, that the preamble of Claim 1 should be construed to require both the storage and supply of hydrogen that complies with the product purity specification. But even adopting this claim construction wouldn't change the result. The Board expressly found that the prior art discloses to a person of skill in the art that hydrogen stored in a salt cavern could become contaminated with carbon dioxide, either through mixing with the gas already present in the cavern or through exposure to residual brine in the cavern. The Board correctly found that that disclosure would have put a person of skill in the art on notice to monitor for carbon dioxide impurities and to purify the gas before delivery to comply with the product purity specification. That's true regardless of the purity of the hydrogen when it's put into the salt cavern. Second, Praxair contends that the product purity specification limitation of Claim 2 should be construed to require 95% purity or greater hydrogen and that the Board erred in declining to impose that numerical limitation. Under this claim construction also, the result here wouldn't change. It's undisputed that at the time of the 011 patent, 95% purity hydrogen was already being stored in a salt cavern at the ICIT site facility, as is disclosed in both the faux and the pottier references. It's also undisputed that it was known in the art to supply hydrogen complying with the 95% or greater hydrogen as is disclosed in the CGA references. The Board's decision sets forth in detail the substantial evidence supporting its findings that a person of skill in the art would have known that hydrogen could be contaminated during storage and that regardless of the purity when it was put into the cavern, it would have known to then purify the hydrogen to remove those impurities before delivery to a customer in order to comply with the product purity specification. Unless the panel has questions, I'm happy to cede the remainder of my time. Fine. Thank you, Ms. Dubrow. Mr. Kostanius has some time if he needs it. I heard my friend here say that claim is something about claim two. Claim two is not in this case. That was part of the IPR that they appealed but then dropped, so the court should not be deciding anything about claim two. With regard to claim three, as I mentioned earlier, I was surprised not to hear anything about the language at page 28 of their brief. And I quote, this is their brief, claim three expressly recites storage of purified hydrogen. It is hard to square that language with the board's holdings that the claims do not require storage of purified hydrogen in the salt cavern. I also didn't hear anything about claim eight. And finally, with regard to the faux reference, the faux reference mentions 95% purity hydrogen. It does not, however, say anything about hydrogen being subject to a product purity specification. And unless the court has further questions, that's what we have to submit. Thank you, Mr. Kostanius. We'll take the case under advisement.